# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID TUTTLE,
 *Plaintiff*,

  v.            No. 3:17-cv-02037 (JAM)

SCOTT SEMPLE, *et al.*,
 *Defendants*.

## INITIAL REVIEW ORDER

Plaintiff David Tuttle has filed this *pro se* complaint that principally alleges a violation of

his rights under the Eighth Amendment while he was subject to solitary confinement for about

one year at the Northern Correctional Institution in Connecticut. I think it is likely that

defendants have qualified immunity, but rather than summarily dismissing the complaint at this

time I will allow it to be served on defendants while also allowing plaintiff to file an amended

complaint within 30 days if he believes that there are additional facts that would suffice to

withstand a motion to dismiss on grounds of qualified immunity.

### BACKGROUND

Plaintiff has filed this lawsuit against the Connecticut Department of Correction's

Commissioner Scott Semple, Warden Nick Rodriguez, Health Services Administrator Brian

Liedel, Dr. Mark Frayne, and Dr. Gerard Gagne. Plaintiff sues each of these defendants for

money damages in their personal and official capacity, and plaintiff also seeks injunctive relief.

The following facts are assumed to be true solely for purposes of my initial evaluation of

the adequacy of the allegations in the second amended complaint. Plaintiff was originally

convicted and sentenced in Massachusetts before being transferred in 2012 to Connecticut in

accordance with an arrangement under an interstate corrections compact. In late January 2017,

he was transferred from the Corrigan Correctional Institution to Northern Correctional Institution (NCI) as a result of an adverse decision in a disciplinary hearing. NCI is a maximum security institution that "is designated to manage those inmates who have demonstrated a serious inability to adjust to confinement posing a threat to the safety and security of the community, staff and other inmates, are sentenced to death, or possess a high bond." Connecticut Department of Correction, Northern Correctional Institution, available at

http://www.ct.gov/doc/cwp/view.asp?q=265436 (last accessed on January 24, 2018); *see also Alston v. Daniels*, 2015 WL 7257896, at *6 (D. Conn. 2015).

On January 16, 2018, plaintiff filed a notice of change of address to a jail facility in Massachusetts. The allegations of this complaint relate solely to the conditions of his confinement and his mental health treatment by prison officials while plaintiff was at NCI from January 2017 until the filing of plaintiff's amended complaint in December 2017.

During the time plaintiff was at NCI he was allegedly in solitary confinement in a segregation unit where he remained in his cell for 24 hours per day. According to plaintiff, he did not leave his cell to go to the outside recreation yard because he refused to be handcuffed from behind and because correction officials have a history of destroying his legal papers and "trashing his cell" whenever he leaves. Doc. #17 at 5-6 (¶¶ 14-15).

Plaintiff has a long mental health history, as alleged in the complaint and detailed in the several documents he has attached to the complaint. Doc. #17 at 6-7 (¶ 18). For example, psychiatric records from 2010 and 2012 reflects multiple diagnoses, including for anxiety disorder, mood disorder, antisocial personality disorder, and intermittent explosive disorder, along with prescribed medications including Neurontin, Doxepin, Klonopin, and Thorazine. Doc. #17 at 23-24; *see also id.* at 26 (mental health record from January 2011 reflecting similar diagnoses as well as for "narcissistic personality disorder").

Plaintiff's documents also reflect behavioral and disciplinary problems. One of these

documents, for example, refers to plaintiff's history of assaulting staff, threatening harm to

others, and destroying property, and this document also describes the need for plaintiff to be

subject to a carefully controlled behavior modification program.  Doc. #17 at 21; *id.* at 25 (noting

diagnosis of "intermittent explosive disorder" that manifests in "aggressive [i]mpulses that result

in assaults or destrusction [sic] of property"); *id.* at 26-27 (noting need for "a behavior plan that

targets disruptive and aggressive behavior," monitoring of plaintiff in segregation, and

"pervasive pattern of instrumental and deliberate circumvention of institutional regulations and

procedures").

According to the complaint, about three weeks after his arrival at NCI, he was seen by

defendant Dr. Gerard Gagne who told plaintiff that he was taking him off Klonopin. Plaintiff

didn't like that. He alleges that Klonopin is a "very important medication," because "it helps

treat anger, agitation, chronic anxiety, irritability, and aggressiveness which if untreated, will

lead to and cause massive adrenaline rushes and uncontrollable rage." *Id.* at 6 (¶ 16). Plaintiff

further alleges that Dr. Gagne put down in plaintiff's "mental health file that he had a diagnosis

of antisocial personality disorder, but he then turned around and removed the diagnosis of

intermittent explosive disorder, sleep disorder and chronic anxiety which are all mental health

diagnos[e]s that the plaintiff had since he was 13 years old." *Ibid.* (¶ 17).

Plaintiff further alleges that he "has talked to both defendants Gagne and Mark Frayne

several times face to face" about his suffering while at NCI in terms of lack of sleep and

excessive noise. *Id.* at 7 (¶ 19). Both Gagne and Frayne "refuse to write down in the plaintiff's

mental health record about the mental health issues that they talk about," and both Gagne and

Frayne "refuse to see the plaintiff for his mental health issues within the 90 days that they are

suppose[d] to see him." *Ibid.* (¶¶ 20-21). Both Gagne and Frayne "refuse to give the plaintiff any

type of mental health medication that will help treat and cope or help him cope with the lack of sleep and the mental health disorders that plaintiff is dealing with and suffering from." *Id.* at 7-8 (¶ 22).

Another medical record from NCI that is attached to the complaint reflects that plaintiff was complaining about the discontinuation of Klonopin but that in April 2017 he was "prescribed Elavil (an antidepressant) and Neurontin (for neuropathy pain)" and that plaintiff "has been assessed to have an ICP mental health treatment needs score of three (MH-3)," which "means that the inmate has 'a mild or moderate mental health disorder (or severe mental disorder under good control); [and] may or may not be on psychotropic medication." *Id.* at 17. According to plaintiff, Gagne and Frayne are "master manipulators" who are "notorious for writing down false notes in inmates mental health records." *Id.* at 10 (¶ 29).

Plaintiff has filed several written complaints and mental health service reviews regarding the change in diagnosis and inadequate mental health treatment he has received. He appealed those complaints to Administrator Liebel who did not rectify the lack of treatment. He also wrote letters to Commissioner Semple and Warden Rodriguez regarding the inadequate mental health treatment, but they never took any responsive action. *Id.* at 8-9 (¶¶ 25-27).

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

4

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Plaintiff has brought his claims against each of the five defendants in both their personal and official capacities. Because each of the defendants is an employee of the State of Connecticut, plaintiff's official-capacity claims against them for money damages are plainly barred by the Eleventh Amendment. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). In addition, because plaintiff has now been transferred to another prison facility outside Connecticut, his request for injunctive relief is moot. All that remains for me to consider are his claims against the defendants in their personal capacities for money damages.

### *Eighth Amendment Claim – Solitary Confinement Conditions*

Plaintiff alleges that in light of his mental health conditions his assignment to solitary administrative segregation at NCI amounted to cruel and unusual punishment. According to plaintiff, he was confined to his cell for 24 hours a day, and defendants subjected him to "long term and extreme social isolation and sensory deprivation conditions of segregated confinement" that "exceed[ed] the limit of human endurance." Doc. #17 at 2.

The Eighth Amendment of course protects against cruel and unusual punishment. "Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978). But that's not to say

that all imprisonment is cruel and unusual. In order to establish an Eighth Amendment violation, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official. *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

As noted above, Congress says that when a judge conducts an initial review of a prisoner plaintiff's lawsuit, the judge should consider not only whether a prisoner's claim is frivolous, malicious, or fails to allege plausible grounds for relief, but also whether a prisoner's claim would be barred by reason of any defendant's immunity. *See* 28 U.S.C. § 1915A(b). Accordingly, as to plaintiff's claim for money damages against the five state official defendants who he has sued in their personal capacity, I must consider whether these officials would be entitled to a grant of qualified immunity from plaintiff's claims.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*). Qualified immunity protects a government official from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010).

Just what is "clearly established" law? The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d

217, 231 (2d Cir. 2014). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the ... constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (denial of qualified immunity on excessive force claim was in error where court "failed to identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles at only a general level").

The Second Circuit has recently granted qualified immunity to prison officials in a case arising from another prisoner's challenge to the highly restrictive conditions of segregation at NCI. *See Almighty Supreme Born Allah v. Milling*, 876 F.3d 48 (2d Cir. 2017). The plaintiff in *Allah* was a pre-trial detainee who was held in administrative segregation at NCI for about 11 months in 2010-11. *Id.* at 53. The Second Circuit described the general conditions of administrative segregation at NCI in which "an inmate typically spends 23 hours a day alone in his cell, and must be put in leg irons and handcuffed behind the back whenever out of his cell." *Ibid.* The inmate is permitted to depart the cell for only very limited times and reasons (such as once a week for a non-contact visit with a family member for 30 minutes, three times a week for a shower for 15 minutes, and five times per week for recreation sessions for one hour). *Ibid.*

The Second Circuit in *Allah* noted that "[i]n many cases, a pretrial detainee's placement in a restrictive housing status like Administrative Segregation may be determined to be reasonably related to legitimate governmental purposes" and that "we have found measures similar to Administrative Segregation not to violate substantive due process where prison officials subjected pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the measures were not excessive in

7

relation to that purpose." *Id.* at 55-56. It concluded, however, that NCI prison officials had

violated Allah's rights, because "prison officials made no individualized assessment whatsoever

of the risk that Allah posed to institutional security," but "[i]nstead, they placed Allah in

Administrative Segregation solely on the basis of his prior assignment to (and failure to

complete) the Administrative Segregation program during a prior term of incarceration,…." *Id.*

at 56-57. Moreover, apart from the lack of an individualized-risk/security-assessment reason for

Allah to be placed in segregation, the Second Circuit further concluded that prison officials had

failed to explain why some of the harshest aspects of segregation were necessary, such as the

requirements that Allah be "kept in solitary confinement for 23 hours a day for almost seven

months" and that "he was forced to shower in leg irons and wet underwear" and that "he

received absolutely no programming or counseling or therapy during that period." *Id.* at 58.[1]

Notwithstanding this conclusion that NCI prison officials had violated the detainee's due

process rights, the Second Circuit in *Allah* concluded that the defendant officials should have

been granted qualified immunity because of the lack of clearly established law that what they

were doing was unconstitutional. Beyond concluding that no prior court decision had ruled on

whether it was unconstitutional for a detainee to be placed in segregation solely because of his

prior failure to complete a segregation program when previously incarcerated, *id.* at 59, the

Second Circuit noted that no decision "has prohibited the confinement of pretrial detainees under

the conditions imposed here if those conditions are imposed upon an individualized finding that a

particular detainee poses a threat to security." *Ibid.* It added in a footnote that "while we hold

---

[1] The 23-hour-per-day lockdown conditions described in *Allah* are similar to those described by plaintiff in his complaint. Although plaintiff alleges that he had to stay in his cell for 24 hours per day, he alleges that he did not leave because of his own unwillingness to be shackled behind his back and because of his concern that prison officials would enter his cell in his absence. It's not clear to me that any of these self-imposed reasons for declining to leave his cell are properly attributable to any of the defendants.

that Defendants violated the Constitution in applying highly restrictive conditions to Allah, we also recognize that in deciding what restrictions could legitimately be placed on a particular detainee, Defendants lacked definitive guidance from the Supreme Court or from this Court." *Id.* at 59 n.7.

In light of *Allah*, it seems likely that the defendants whom plaintiff has sued here are entitled to qualified immunity from plaintiff's Eighth Amendment solitary confinement claim. Indeed, plaintiff as a convicted prisoner has fewer rights to protection from severe conditions of confinement than the plaintiff in *Allah* who was a pre-trial detainee. *See, e.g.*, *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (*en banc*) (lengthy discussion of distinction between protections for pre-trial detainees under the Due Process Clause and sentenced prisoners under the Eighth Amendment). Therefore, plaintiff here has a steeper road to recovery than the plaintiff in *Allah*, and *Allah* itself disclaimed ruling on the rights of a convicted prisoner. *See* 876 F.3d at 53 n.1 & 58 n.6. It remains debatable to what extent the protections recognized by the Second Circuit for the segregation of pre-trial detainees in *Allah* apply to a convicted prisoner like plaintiff in this case.[2]

Nevertheless, in case I am wrong about that, I will assume for the moment that *Allah* applies with equal force to Eighth Amendment claims. Even so, it looks to me like the defendants would likely still have qualified immunity. For example, to the extent that *Allah* requires an individualized risk/security assessment as a predicate for assignment of a prisoner to administrative segregation at NCI, the records that plaintiff himself has submitted suggest a lengthy history of assaultive and threatening conduct, indicating strong reason to believe that

---

[2] Plaintiff alleges that "numerous federal courts have ruled that it is unconstitutional to confine a seriously mentally ill prisoner to segregation." Doc. #17 at 9 (citing district court cases from Connecticut, California, Texas, and Wisconsin). But plaintiff cites only district court cases, and district court decisions do not "count" as "clearly established" law for qualified immunity purposes. *See Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006).

prison officials could reasonably have believed it appropriate for security or disciplinary reasons

to assign plaintiff to a segregated housing unit. As plaintiff himself alleged in his initial

complaint in this action, he ended up in segregation at NCI only as a result of a prior disciplinary

hearing at the Corrigan Correctional Institution, which hearing concluded that plaintiff had

threatened another inmate. Doc. #1 at 10 (¶ 26). Although plaintiff has separately disputed the

fairness of that disciplinary hearing, *id.* at 10-17 (¶¶ 27-44), there is nothing to suggest that any

official at NCI whom plaintiff has named as a defendant in this lawsuit had anything to do with

the hearing at Corrigan such that any impropriety with the hearing at Corrigan should be

attributed to defendants.

As to plaintiff's complaint about the harshness of the conditions to which he was subject,

the defendants are no more liable for those conditions than the defendants in *Allah*. Not until the

Second Circuit's decision in *Allah* was it (arguably) clearly established that prison officials must

be prepared to articulate a justification for each of the individual restrictions placed on a detainee

in segregation. *See Allah*, 876 F.3d at 60 n.7 (noting that "in deciding what restrictions could

legitimately be placed on a particular detainee, Defendants lacked definitive guidance from the

Supreme Court or from this Court").

Substantial authority suggests that the use of solitary confinement may cause grave harm,

especially to inmates who have mental illness. *See, e.g.*, *Williams v. Sec'y Pennsylvania Dep't of

Corr.*, 848 F.3d 549, 566-69, 572-74 (3d Cir. 2017); *Peoples v. Annucci*, 180 F. Supp. 3d 294,

298-300 (S.D.N.Y. 2016). My role here, however, is not to pass upon potential policy or legal

reforms but solely to evaluate the possible monetary liability of individual defendants in light of

what was or was not clearly established law. *See, e.g.*, *Freeman v. Berge*, 283 F. Supp. 2d 1009,

1016-17 (W.D. Wis. 2003) (noting that "agreement among mental health professionals regarding

the deleterious effects of solitary confinement does not translate into legal notice that defendants

may have been violating the Eighth Amendment" and that "[i]n the absence of case law concluding that conditions similar to those alleged by plaintiff are unconstitutional, I must conclude that defendants are entitled to qualified immunity on plaintiff's claims that he was subjected to sensory deprivation and social isolation" from solitary confinement).

In short, I conclude in light of *Allah* that defendants likely have qualified immunity from plaintiff's Eighth Amendment challenge to his solitary confinement conditions at NCI. Still, in view of plaintiff's *pro se* status and the enormity of the deprivation at issue (about year of solitary confinement), I will allow the complaint to be served on defendants and also allow plaintiff one more opportunity to amend his complaint to the extent that he believes there are any additional facts that may counsel against a grant of qualified immunity with respect to plaintiff's solitary confinement claim. Defendants may then seek dismissal on qualified immunity grounds if they believe there is a basis to do so.

One additional question with respect to the potential application of qualified immunity is the timing of the Second Circuit's decision in *Allah*. The decision issued on November 22, 2017, more than two months after plaintiff's initial complaint on September 7, 2017, and a few weeks prior to filing of plaintiff's second amended complaint on December 7, 2017. To the extent that *Allah* may be relied on by plaintiff as creating clearly established law, it appears that the vast majority of time that plaintiff was incarcerated at NCI occurred prior to the issuance of the *Allah* decision. If plaintiff chooses to file an amended complaint, plaintiff should specify what conditions and deprivation he experienced that occurred after the *Allah* decision issued on November 22, 2017.

### *Eighth Amendment Claim – Mental Health Treatment*

A prison official's deliberate indifference to the safety or serious medical needs of a prisoner—including serious mental health needs—violates the Eighth Amendment. *See Spavone*

*v. New York State Dep't of Corr. Serv's.*, 719 F.3d 127, 138 (2d Cir. 2013). A prisoner who claims deliberate indifference to a serious medical need must satisfy two requirements. First, there is an objective requirement—that the prisoner's medical need was sufficiently serious. *Ibid.* The prisoner must show that he suffered from an urgent medical condition involving a risk of death, degeneration, or extreme pain. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

Second, there is a subjective requirement: that the defendant have acted recklessly—that is, with an actual awareness of a substantial risk that serious harm to the prisoner would result from the defendant's action or non-action. *See Spavone*, 719 F.3d at 138. It is not enough to allege simple negligence or negligent medical malpractice. *See Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Instead, a prisoner must show that the defendant acted with the equivalent of a criminally reckless state of mind when denying treatment for the prisoner's medical needs. *See Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

Plaintiff's complaint centers on Dr. Gagne's change in diagnosis, his clinical decision to stop prescribing Klonopin, and the refusal of both Dr. Gagne and Dr. Frayne to write more notes in the records or prescribe the medication that plaintiff preferred. These allegations are conclusory in large part and, to the extent that they allege specific facts, the factual allegations expose no more than a difference of opinion about plaintiff's mental health diagnosis and the resulting proper course of treatment. A mere disagreement about doctors' choice of treatment does not violate the Eight Amendment. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *see also Armstrong v. Miller*, 2016 WL 3149733, at *5 (N.D.N.Y. 2016) (claims that defendants "changed plaintiff's diagnosis, discontinued his previous medication and replaced it with another, … are nothing more than a disagreement with the nature of treatment, and are insufficient to state an Eighth Amendment claim.").

I would ordinarily dismiss such a complaint but for the fact that plaintiff further alleges—somewhat cryptically—that Gagne and Frayne "refuse[d] to see the plaintiff for his mental health issues within the 90 days that they are suppose[d] to see him." Doc. #17 at 7 (¶¶ 20-21). This seems to suggest that plaintiff may have gone without any mental health treatment for up to three months, all while he was under the challenges of solitary confinement. This is enough for now to allow to proceed plaintiff's Eighth Amendment claim for deliberate indifference to his serious medical needs. If plaintiff chooses to file an amended complaint, plaintiff should consider clarifying his allegations to make clearer the extent to which he believes the defendants denied him necessary mental health treatment and any non-conclusory basis for believing that any of the defendants acted not merely negligently but with the equivalent of a criminally reckless state of mind.

### *Discrimination under ADA and Rehabilitation Act*

Plaintiff alleges that defendants violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act by failing to provide adequate mental health care and by placing him in segregation despite his mental illness. To state a *prima facie* claim for discrimination under the ADA or the Rehabilitation Act, a plaintiff must allege: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *see also Wright v. New York States Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (discussing identical elements of ADA and Rehabilitation Act claim in prison context).

Plaintiff has not plausibly alleged an exclusion or discrimination claim under either statute, because he has not alleged any facts to suggest that prison officials decided to exclude or

13

discriminate against him *because* of his mental illness. He has alleged that he was placed in segregation at NCI as a result of his transfer due to a disciplinary violation involving a threat to another inmate. There are no facts pleaded to suggest that he was singled out for segregation because of his disabling mental illness, as opposed to his disciplinary violation. *See Gonzalez v. Maurer*, 2017 WL 4531685, at *3 (D. Conn. 2017) (dismissing prisoner's ADA and Rehabilitation Act claims based on denial of eye care, because the prisoner's "complaint is that he has not received treatment for his vision, not that any vision disability prompted any of the defendants to discriminate against or disadvantage him").

## CONCLUSION

(1) Based upon the Court's initial review, the Court will allow to proceed plaintiff's Eighth Amendment claims arising from his alleged solitary confinement and the alleged denial of mental health treatment against Commissioner Semple, Warden Rodriguez, Administrator Liedel, Dr. Gagne, and Dr. Frayne in their individual capacities for damages. Plaintiff may file an amended complaint within 30 days if he wishes to allege any additional facts that may withstand a motion to dismiss on grounds of qualified immunity. Plaintiff's claims under the ADA and Rehabilitation Act are DISMISSED with prejudice as any amended complaint would be futile in light of plaintiff's allegations to date. No discovery shall proceed until defendants have had an opportunity to file a motion to dismiss on grounds of qualified immunity.

(2) The Clerk shall verify the current work addresses for Commissioner Semple, Warden Rodriguez, Administrator Liedel, Dr. Gagne, and Dr. Frayne with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the **thirty-fifth (35) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall make

arrangements for in-person service by the U.S. Marshals Service on him, and he shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(3) Defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

It is so ordered.

Dated at New Haven, Connecticut this 5th day of February 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge